May it please the court, Neil Smith here on behalf of the appellant Milanian. This is a trademark case where a large company, Caesars, has an advantage in that they are in a local court and have a case involving a weak, impecunious defendant hauled out to Nevada to have to deal with this case. Those things happen, but what is going on here is an attempt by Caesar to use this case as a vehicle to monopolize a generic term as a trademark. They have no registrations. I'd like to reserve five minutes. So they have no registrations. They file for it. And the there is another party to protect in this case, and that is the public in the context of the right to use a generic term. The term here in the field is the word coliseum. For a large auditorium, the Oakland Coliseum, other coliseums around the country, and Caesars has used that name as a name for a place in their complex. They put in their evidence of use maps showing that coliseum-like ballroom, Coliseum Roman I, Roman II. Now, your client has registered this name along with a bunch of other names. Why would your client try to register a generic term? Well, the client is registering or has filed applications, and they have been allowed, and they were not opposed by Caesars, for management services for not for a building, for a location, but for services related to hotels or casinos. Those are published for opposition, and Caesars did not oppose that. The client's registrations they've been allowed are based upon different services. It is possible, for example, it is possible to register a trademark or use a trademark that may be generic for other purposes for a different use or for a different service, and they're different services, so it's possible in that context. What Caesars has come out of the woodwork with is trying to show use based upon a building, a place that has not been used as a trademark in order to try to support that. Now, I like the definition from Professor McCarthy at USF. A trademark answers the buyer's question, who are you, where do you come from, who vouches for you, where a generic term or name of a product answers the question, what are you, and you have to ask the question in Caesars' use as to Coliseum, what are you. You're a building, you're an auditorium, you're a showroom, whatever use is being made of that, but it's a building use for a place as opposed to a trademark use for a service or goods. So the materials that have been put in in terms of the use show the nature of those services. Now, what happened here, and I understand that my client is not a sympathetic figure, in that he missed a deposition, and, you know, there are notes from doctors with respect to that. He was ill and unable to take a deposition. Originally Caesars had said to the court, represented to the court, that they didn't want any discovery, didn't need any depositions, and then a few days before trial they noticed his deposition. It turns out to be that he's ill. His father went in the hospital that day, and his father ultimately passed away. And those things happen. It's not the way I would, you know, have my clients do that, but that happened. And in the context of that, it had been represented to the court that the case would basically come from his testimony, and he was unable to make that deposition and did come to trial. Now, they get chided for his having come to trial. But, you know, as ill as you may be or grieving as you may be, you know, a lawyer says, you know, a judge says you're going to go to trial, you get out to Nevada and you go to trial. So if he didn't show up for trial, they'd be complaining that he didn't show up for trial. So, you know, in that context, I can't criticize him for not being there. There were his testimony was excluded without the proper consideration of the rights of a defendant under those circumstances to give a deposition in the evening or find other ways to do that rather than exclude his testimony. And that in large part resulted in the result that it did, because he gets chided for not being able to put on his case about the good faith of the use of his trademarks. That was all within his own testimony. When he couldn't testify about that, of course, it's likely that he's going to lose. So we treat his error, the exclusion of his testimony in the context of that.   The court has made a decision as to what means by which this deposition could be taken. There was a motion under Rule 37 to seek sanctions in the trial court, which could be monetary, evidentiary or terminating sanctions, right? He was represented at that hearing. Did he offer to say, you can take my deposition at night, you can take my deposition at another time, you can try the case? Was the court was arbitrary in imposing evidentiary sanctions? My understanding is that he was available and that he would be willing to do that. And that's all the discussion. The motion is in the indicative. Did he offer to do anything to take the deposition at a different time? I don't know. I don't know whether he did it. I don't know whether he did or not. We'll look at the record with respect to that. But why was the trial judge arbitrary in saying, I have a choice here of imposing sanctions, monetary sanctions, so that your deposition can be taken again, paying an attorney's time to prepare, to pump up and travel, or I can impose evidentiary sanctions, you can't testify as to certain things or not at all, or I can apply a terminating sanction and just enter judgment for the plaintiff. But I'm going to do the middle one. I'm going to do the evidentiary sanction. What's arbitrary and unreasonable? I think that's the test we have to look at. What's arbitrary and unreasonable? And then show me the portions of the record which sustain your position. Well, I think it was a pattern of a rush to judgment in that context. He – I mean, you know, judges make those suggestions, and you've been a trial judge and you've had that opportunity to do that. Judges make that suggestion. Parties make those suggestions. He filed a motion for summary judgment. The court said that's too late. It was filed on the day for responding for a preliminary injunction, very early in the case. It's true they were moving towards trial. Let's stay with the deposition. Okay. What's arbitrary and unreasonable about the sanctions imposed for his failure to show up at the deposition? The statement that he – the order that he will not be given the opportunity to testify under the circumstances. He's there. And what about the circumstances made it unreasonable and arbitrary of the judge to impose the evidentiary sanctions? That the court didn't look for other ways. What other ways were presented by Mr. Melanion as you're saying under Rule 37? As you suggested. I don't know. I wasn't present at trial whether those offers were made in writing. Certainly that's – Tell us now. Where in the record is there Melanion saying, I'll come tonight because I can't come right now because I'm sick or my father just died, but I'll do it two days hence after the funeral. Where's that? Melanion was there at trial. He was on the witness list and at the beginning of trial, in the trial testimony, there was a request that he be excluded. And the order was granted. That's my understanding. I do think that – I know, sticking with that, I do think there is somewhat of a pattern of lack of consideration of some of these things and a rush to judgment. Some judgment was not acted upon. It was characterized as being late, but my understanding is there's no local rule that would have made it late. It was very early in the case. It was on the date for preliminary injunction response. I mean, it could have been denied and considered, but it wasn't considered.  And more serious than that is the use of the addition of a cause of action relating to a trade secret claim that was a incohate claim that may have existed in response to the motion for preliminary injunction and in support of the summary judgment. There were three letters put in, which were put in in response to the argument that my client was an interloper and just came up and raised his claim with respect to this before Caesars came out with their coliseum, with Sion Dion coming into that recently. And he said, no, I've been involved in that business before. Here's something that – here's some discussions we even had before regarding that. It wasn't regarding that name. It didn't relate to that name. But it did. The letters involved Rome Coliseum. And I thought the position was, Caesar, you didn't think of this idea. I thought of it back in 1996 when I sent you these letters. And here's the acknowledgment from your corporate officer saying that he didn't have any use for it at that time. So my question is, why is that not a compulsory counterclaim as arising out of the same problems or same general facts out of which this claim of Melania – Well, because it doesn't relate to the trademark cause of action. It relates to a confidential disclosure. If he establishes a confidential disclosure and that he was the seminal idea behind the use of coliseum for a gambling casino, because before that Caesar's world was box-like and was not round and wasn't – looked like the real Roman Coliseum that we've known and loved, why isn't that a defense to Caesar's case or at least a cause of action arising out of the same aggregate facts which would diminish the recovery of Caesar's? Well, this is not a trademark case that my client filed. It was a case filed in New Jersey. No, not the trademark case. The case filed in New Jersey, the trade secret case. What I'm saying is the case that was filed and characterized by Caesar's was a trademark case. It dealt solely with the trademark aspects of that, solely with coliseum as a trademark. The disclosure was what I would call in California a Desney v. Wilder type claim with respect to an idea or a concept where there may be some right to remuneration. That does not arise from the same facts with respect to that. If it arose with respect to the same facts of that, then Caesar's should have – or the court should have been more responsive to give notice and say Caesar's should have moved to amend their complaint, to say let's have a DJ on that. I'm talking about if they saw that. If they saw that as clearly as you characterize it. I didn't. But if they saw that that way, then Caesar's should move to amend early on, as soon as those documents were put up. They should give notice and file a motion with request – with respect to that. And – A plaintiff seeking declaratory relief as to his trademark must affirmatively plead for relief as to an inchoate claim of a defendant that might reduce his recovery? That's – no, that – they're asking for a declaratory judgment with respect to the New Jersey one. And that's what they did. They moved on the last day of trial to add that sixth cause of action for a declaratory judgment that they did not – did not infringe – did not violate the trade secrets, but on the last day of – last day of trial. Well, because the court has said dismiss New Jersey and bring it here. Well, that – at a time – at a time later. But the – the – there should have been – if there were a trade dress – excuse me – trade secret cause of action that should have been in this case, Caesar's should have seen that. And that should have been the subject. And I think – I think the client's lawyer said that at the time. Bring on a motion for the relatedness and we'll deal with that issue. Don't wait till the end of the trial and move to amend when they haven't had the opportunity to do that. It's further made more serious by the fact that there is no testimony with respect to that issue. If that – because that's within the client's knowledge. He made that individual disclosure. He would be the only one that would do that. There's been no real testimony with respect to that issue. So they play gotcha in the sense that they get the witness excluded. They deal – they bring this cause of action in the last – at the last of the trial, move to amend, and then the – Did you make a motion at that time to allow Mullanian to testify as to something that was not in the pleadings and therefore purported – one could arguably say was not the subject of the order that he couldn't testify? The court took that portion of it, I think, under advisement at the end of the trial. Did you make that motion that Mullanian be allowed to testify at least as to the New Jersey trade secrets case? The – there was no motion made to add that cause of action. When the court said, well, consider adding that cause of action at the end of the trial, it was too late. He had already been excluded from testimony. Did you make a motion to reconsider the motion to exclude his testimony and say, let him testify as to this since it wasn't the case to begin with? There was a motion to – for reconsideration. I don't know if it dealt specifically with that. I think at that point, he was – you know, it was pretty well too late with respect to being able to do that. Okay. You have about four and a half minutes left. I want to reserve that. Thank you. Thank you. I'd like to reserve four minutes, please. Good morning, Your Honors. My name is Stephen Feingold and I represent the plaintiffs in this case, the FLEs. I think it's important to start with the fact that this is a case of trademark squatting. This gentleman, Mr. Mullanian, contacted Caesars on June 1st, shortly after they had announced that Celine Dion would be appearing at a $95 million facility to open next March, the March that – a year and a half ago now, that – and announced that that facility would be named Coliseum. That was previous to a year ago when they had made the first announcement without indicating Celine Dion. The record shows that within 10 days of the first press release, Mr. Mullanian filed an intent-to-use application. It also shows that he, at the time he called us, had a notice of allowance, which means that the registration would issue once he filed a statement of use. When he called Caesars and demanded to speak first to the General Counsel and then to the President and then was finally told that no one was available and yelled at several secretaries, which is part of the record, we contacted him and his attorney and arranged for a meeting on June 10th. Again, this is all in the record. At that time, we showed him our prior use of Coliseum for – back to 1966. We explained what we had been doing, and they said they would get back to us. They did not. We wrote letters asking for them to confirm that they would withdraw their assertion of national rights around the country in August and again in September. There was no response until in late September the law firm of Gringshoffer, which is the law firm of noted trademark scholar Jerome Gilson, wrote a letter demanding that we prove evidence of priority. At that point, it was clear to us that in order to save the opening of the Coliseum that next March, we had to seek immediate declaratory judgment. Caesars had spent a tremendous amount of sums not only monetarily to build the Coliseum but was also involved in a much more expensive operation to revive the Caesars Palace brand on the Caesars Strip. You know, I'm confused because opposing counsel says that the use of the term for your building was generic. Why couldn't you just put the name up? Well, we've asked Mr. Millennium to withdraw his assertions of claims against us, and we asked him to withdraw his application. He refused. It is true that we filed an application the day that we received the phone call on June 1st. I would also note, though, that that application was not for facilities. That was for services. And the services were entertainment service, convention services, food services, and a variety of other services. To the extent that Mr. Millennium claims that management services are not generic for Coliseum, the fact that it's being held in a building that is called the Coliseum does not make the services generic. Maybe it makes them descriptive. That's what the Trademark Office found when it rejected the application. However, we are in the process of negotiating that issue and responding to the Trademark Office, but I would point this Court to the tennis-in-the-round case decided by the TTAB where they held that a trademark for a tennis facility that was circular was not descriptive, was not descriptive even though it described the shape of the services would be provided because that was so incongruous with the concept of where you play tennis that it was therefore different, and therefore was suggestive. It took a mental leap to associate that you were playing tennis-in-the-round, meaning a round building. That's not typical. It also takes a tremendous mental leap to think that a Coliseum, which means stadium or arena, refers to a theater. The Coliseum in Las Vegas, as all of the other uses of my client's mark, are for a theater, not for a stadium and not for an arena. And I would suggest to you that they're not interchangeable. You can say I went to the Coliseum to see the Oakland A's play. If someone said I'm going to the Coliseum to see the San Francisco 49ers, people would wonder what he was saying. Stadium and Coliseum are just not interchangeable. They may have a dictionary similarity, but this case, this court has held in the Filipino case that it's a mistake to rely exclusively on dictionary definitions. And we provided testimony about what the meaning of stadium, what the meaning of Coliseum was, and interestingly enough, in response to a question that you asked earlier, the other side never objected to that evidence as being partial or not partial evidence or objective evidence, and indeed, on cross-examination, they sought to expand on what the architect hired by Caesars to build the Coliseum, as well as a vice president in charge of the development, they asked them on cross to expand on that definition. So they therefore found it worthy to try and get further definitions from that witness. They therefore can't complain that that evidence is somehow tainted. But more importantly is this whole issue of genericness is decided under a clearly erroneous standard, and the judge made findings after determining the credibility of the witnesses, after seeing all the evidence, and made a conclusion. He applied the correct law. He found that the burden was placed on the plaintiffs to show that this was not a generic  problem. He found, looking to the standards that this Court has often found relevant to those issues as to length of views, manner of views, impressions of experts, impressions of the consuming public, he looked at those factors and reached a decision. There was nothing in the record other than their claim of dictionary evidence, which we don't think in itself supports this, because this is not a large facility. It is not an amphitheater. It is a 4,000-seat facility. But that's the only evidence they have in this record as to why it's generic. We don't think that that can be called clearly erroneous. Their sense now that this is even unfairly prejudiced because they were excluded ignores the fact that from the very beginning, this defendant, who really is in many ways the punitive plaintiff, this defendant refused to participate in the trial process. After refusing to give us an acknowledgment of our rights, though he was not going to sue us, he then asked for repeated delays from the district court. We had asked for a trial date of December 1. The judge didn't even have the first hearing on this case until December 19 because he wanted to give Mr. Millennium opportunity to find counsel. When that counsel appeared, they announced to the Court they were withdrawing. The Court warned Mr. Millennium that the withdrawal of the law of the entrance of a new lawyer is not a justification for postponing the trial. And he also found at that time that the defendant was trying to delay the trial. Then on January 6, according to an affidavit that the next lawyer to come into the case submitted, he was retained on January 6. He filed a motion on January 9. Was the motion timely? Under Local Rule 7 of the District of Nevada, that motion could not have been heard until after the filing of the – after the commencement of trial. So there was no way the motion could be timely heard. There was no motion to expedite its hearing. There was no explanation as to how it could be fit with the judge's schedule. It was a clear attempt to delay. And in his affidavit that he filed with the Court to request his withdrawal, which was denied, he said, I was retained expressly for the purpose to file a motion for summary judgment and or settle the case. But if his intent was to settle the case, why would an attorney who was retained on January 6 not advise us that he had filed a motion on January 9, but file it – but send it by regular mail so it did not arrive until January 13? And why, when his client told him on Friday before Monday deposition that he was too sick to attend, would he tell his client to call us as opposed to calling us himself? If he was trying to settle the case, you don't try and do that with only – in that short a period of time. You'd call your counsel immediately. It was a delay tactic. And then there was, I believe, a – and the record clearly shows this was a clear attempt to then use other tactics to get the delay. He did not show for the deposition, did not proffer a doctor's note to the Court until Wednesday. Tuesday there is evidence in the record that there was a court conference with Mr. Millennium's counsel and us in which the judge said to him, give them a time for the deposition. The next day, the lawyer said his client could not be available for a deposition, and that's when the Court on the following day on Wednesday, January 15, said, well, if he can't be available for a deposition at all before trial, and this doctor's note is clearly insufficient, it doesn't say how long he's been treating this patient, how he's treating this patient, and when this patient is going to have any chance of recovery, he found that was insufficient to make a conclusion that this was, in fact, a credible excuse. And then he ordered that Mr. Millennium would be precluded. There was no other choice. We actually moved at the day of trial, once Mr. Millennium showed up, we moved to have the whole case dismissed at that point, a false judgment entered, and the judge  was not able to make a conclusion. He was not being unfair to the other side. He was trying to execute his courtroom and abide by a schedule that, again, could have been avoided if Mr. Millennium had merely acquiesced to the fact that he could not sue us. The fact that this information came forth on January 6 was also, again, part of an effort to intimidate us into settlement, to make an offer. There were finally settlement discussions on the 15th. It was only on the 17th, when the settlement we thought we had reached was rejected because of a dispute over whether there would be a general release or not, was it clear to us that, in fact, Mr. Millennium had been holding out on what he perceived to be trade secret claims. Now, whether you believe it was an enforceable settlement or not, it's clear that   He had been holding out on what he perceived to be a trade secret claim. He had not made the general release but was holding it up. And at that point, Mr. Silverman, the lawyer who tried this case, made his first appearance and his first words to the Court after Mr. Byoff, the lawyer who was trying to get out, was withdrawing, was, we're going to need many months to get local counsel. But I still need an extra two days, a week. All he asked for was for many months. On the day of trial, he asked for a motion to stay the case while it could be heard at the TTAB. But there was no case pending before the TTAB. There was never a motion saying, we will make Mr. Millennium available tonight, after the first day of trial, for the plaintiffs to take his deposition so he can testify. And there was no – I don't believe there was any duty on us or the Court to seek out that concessions from them in light of the facts as they had been developing. And so we did, however, in our proposed findings of fact conclusions of law, actually say that we thought these were compulsory counterclaims, but that if the Court disagreed, that we wanted to leave to file an amended complaint. So they had that information in front of them before the trial started. Also significantly is that they said on that Friday, what is this trial about? And the judge told Mr. Silverman it's a trial on everything involved, including the Empire March, which they say they did not have notice of. But they – they said, well, let the plaintiff amend his complaints if there's other issues there. And on his opening statement, he also, Mr. Byoff – Mr. Silverman referred repeatedly to what he was going to show. This is at a time when he knew his client could not testify. But he still proffered to the Court that he would be showing evidence about this 1996 event, the fact that it involved the use of the Coliseum, the fact that this was a man who had patents, business plans. Well, what are those patents and business plans? He has patents for the use of a Titanic-shaped casino. And he has over, I believe, 30 trademarks on an intent-to-use basis that he's filed. And what is the basis on which those trademarks were all made?  has a website on a – on a Internet site called resortcenter.com that says essentially Mr. Millennium offers the following services, each under its own title, management services, consulting services. When he first did that website, and this is in the record, the website actually said he offers license and buyout rights in these marks. That shows that he did not have an intent-to-use the marks. That's a bona fide intent as required by the Lanham Act for an intent-to-use application, but was merely engaging in trademark swatting and was trying to reserve rights. He had done this to the owners of the Titanic trademark. He had tried to do this to investors in a San Francisco-themed casino in the record, and now he was going to try and do it to us. Kennedy. Are you going to address the fugitive disentitlement issue? Your Honor, I will. First, I should bring you up to speed that on last week we received a payment of $10,000. However, the sanction order was for $10,000 plus $1,000 penalty for every day that it wasn't paid. Today I received – last night at 11 o'clock I received from my office a document that was filed yesterday in the District of Nevada saying that there had been partial compliance with the – with the sanctions order. But as of the moment, the bench warrants still exist. And last Monday, two days ago, Mr. Millennium did not appear at a deposition that we had noticed for purposes of enforcement, and we were told that that's because his lawyer was not able to be in contact with him. However, on Monday evening, we received notice that Mr. Smith was appearing. And I know Mr. Smith, and he's a highly respected member of the bar, and it's a privileged argument against him, but – and I – but I think that he had nothing to do with this, I'm sure. But we were told by trial counsel that he had no contact with his client. Maybe this trial counsel has been replaced the way that previous counsels have been replaced, I don't know. But at this point, there's still an outstanding bench warrant. There is still the fact that he did not appear at the deposition on Monday. And it's our belief that this gentleman should be precluded from continuing the appeal. Kennedy. Well, the bench warrant would be for the purpose of taking him to custody to enforce the contempt citation if he's already purged himself of contempt by payment of the $10,000. Is there something further to be accomplished by taking him into custody? Well, I think, first of all, Your Honor, he hasn't purged himself of contempt if he hasn't paid the full amount. And what is the full amount? The full amount would be, depending on if you calculated the penalty as terminating on the date that the bench warrant issued or the date that he tendered the payment, it would be anywhere from approximately $150,000 to $300,000. Now, you're immediately, I suspect, going to ask me, well, is there any chance in the world that he has this money? The filing of 180 applications over the course of two and a half years with the various notices that he had to file to maintain those applications must have cost him at least 100 times 300, and my math is bad, but if I do it correctly, I think that's $300,000. This is a gentleman that also professed to not have any money to pay us, but while trial counsel may be doing this on a contingency, I'm sure that Mr. Smith is not here on a contingency arguing an appeal. And Mr. Byoff is here today in the courtroom as well, even though he withdrew from the case over a year ago. So I think there's many questions as to what his true financial situation is, and certainly the judge found that the affidavit that he filed was woefully insufficient. I understand that you can't. Kennedy. Who issued execution and had it returned unsatisfied? We tried to execute. He has no assets that are attainable at this time. Therefore, you've got an order of examination of the debtor. That's what he refused to show up to on Monday. You can interpret this case as Caesars being overzealous. I appreciate that. I have to tell you candidly, we have tried to handle this case as mildly as we could. We had someone trying to extort money from us. We asked for him to withdraw those claims. When we didn't, we filed claims. He proceeded to insist on this matter going forward. A settlement was apparently reached until we found out that, no, it was only going to be a settlement on a trademark claim, but then we were going to obviously be faced with a lawsuit. The disingenuousness of Mr. Millennium's intending there was no case in controversy to be adjudicated in the amended complaint, but then while the papers were still pending and making that representation, filing a State court action but not serving it on us so we could not bring it to the court's attention until after the order issued, then repeatedly over and over again making assertions. There was an assertion that the affirmative defenses of contract was once we saw the trade secret information, we understood what the affirmative defense had attempted to say. There were repeated allegations that that was because the co-defendant in this case, there was a contractual arrangement between them. However, if you look at the record, and I can provide it to you when I sit down, in the stipulation of settlement, or I'm sorry, the stipulation of entry of judgment against this co-defendant, there's actually, as one of the factual predicates, the statement that they had no contractual relationship with Mr. Millennium at any time with respect to any trademark or trade secret issue. The only thing that that affirmative defense related to, the only thing it could relate to, was the assertion of these trade secret claims, which were revealed because it was considered at the time to be strategically useful, and then when it was not, didn't get the desired result, they wanted to have the ability to cut and file a lawsuit somewhere else. I would reserve the rest of my time. I think you, didn't you drop your cross-appeal? We, why did we cross? No, no, you did drop your cross-appeal. We did. Yeah. Under our rules, you're not allowed to serve a bottle unless you, it's on a cross-appeal issue, so. Well, then before I sit down, I'd better step back. You ought to make your points. I would just ask if there's any other questions. Yeah. Okay. Thank you. Thank you. First, filing 100 trademark applications at $300 is $30,000, not $300,000. So this is not a, it's some money, but it's not as much money as we're talking about there. On this point, is there more than $10,000 owed? My understanding is no, there is not. That the $10,000 was owed, there was a reference to a possible fine with respect to that, but there's been no warrant or enforcement with respect to that. My belief is that that has been satisfied. So that is, in your view, it's been purged? It's been purged. Now, we can go into the fugitive issue with respect to that. If you look at that, where that came from in the context of this, it is an order by the district court in Nevada saying dismiss or withdraw. Dismiss with, let's say dismiss with prejudice or withdraw. I've read all that garbage. Yeah. Well, that was my feeling, too, is the lawyers got notice of that. It said dismiss with prejudice or withdraw. Withdraw sounds like without prejudice. They immediately sent overnight to file without prejudice, and that was done. And then they said, no, that's not right. So they did it with prejudice that time, and then by that time was in federal court, and the district court judge there didn't understand what they were driving at and ended up doing what I think is a without prejudice, at least as respect to this case, this appeal. So I think that somewhat of an undeserved fugitive status as a result of that and then put that in with his not having the money, that's kind of what happened. There's this reference that just came up with respect to this debtor examination, and Judge B asked, you know, did you follow that through and did you do that? This case has been pending in this court because it takes a long time to have your appeal for a year and a half or so. They did that. They noticed that on nine days' notice for five days before this hearing. They noticed it for last week. They just noticed this deposition on very short notice, this debtor's examination, and then they complain when he can't make it. I mean, you know, they know when they did depositions before. He's a hard guy to get in touch with, and, you know, you don't always do it. But to do it on nine days' notice, which is unreasonable, five days before this, and then come in here and say, you know, he's doing it again, I think that's unfair. And, you know, we've offered to try to make him available for that and to cooperate with respect to that, but not on such short notice now. Okay. There's a, you know, concern about the raised by counsel here with respect to the lawyers, and this is done for purposes of delay. Now, certainly lawyers are busy. They're scheduled out on 30 days. They may come in for limited purposes, and this was a rush to judgment. And, you know, you have to give him some ability to get lawyers and to be able to do that and, you know, and those things happen. I don't think they were for purposes of delay in the sense of vexatious litigation or whatever, other than to get time to do it and to be able to find time to try the case. Not many are available, like I am, on short notice to come in and argue an appeal. You know, those things happen. With respect to the generic use, you know, what the court should guard against is the use of this case as a vehicle to find that a coliseum is a trademark for coliseums. And they tell you it's not a place. But their first exhibit, which is Exhibit — it was Exhibit 28 on page number 104. Their first exhibit is Battles Raged There, Chariots Roared There, Beasts Ravaged There, and Now Selene Will Play There. There is there. Now, there may be no there there, but there is a place, and that's the reference to it. And, you know, this is the first example, but if you go through their maps with respect to that, and their use doesn't go back as a trademark use. The court adopted — the findings that the site, the court adopted, virtually they were given to the court on disks so they could be modified. There were, you know, there were virtually no changes with respect to that. It's findings they've written to create a generic trademark out of — create a trademark out of a generic term. You know, with respect to the cross-examination of a witness, I don't think you can draw — particularly when your client can't testify, you can draw the fact that we make inquiries to cross-examine a witness, and sometimes you ask a question that you don't know the answer to, and sometimes you do. But to draw a positive fact from the fact that a lawyer was doing the best to cross-examine, maybe a witness doesn't necessarily do that. And finally, to answer the court's question with respect to that, it was Caesars that saw this as a vehicle to get themselves a trademark out of a generic term. I think Judge Fletcher's question is correct, is what's the problem with Caesars using Coliseum as a name of a place or a building for Coliseum? There may be no threat there. Thank you. Judge Fletcher asked me a question that was on my mind. The party's been at this a long time, and apparently, regardless of what we do, it's not going to be over necessarily. Would the assistance of the circuit mediator help in perhaps resolving all these claims? And your answer will not influence the answer. I would suggest that. I'm the new kid on the block, and I always think that's a good idea in the context of that. I came in relatively late, and there wasn't time, little time I had here to prepare to do that. But I would think that would at least be worthwhile doing. When we participated in that earlier, we told the mediator we were happy to participate, but we made an offer. Prior to after the trial began, we made an offer. We never received a counteroffer. Okay. I think we'll consider that. And a lot of times what we do is to send out a letter asking you if you're interested in that process and setting a time limit on that. And if you don't want to participate, that's fine. It seems to me, though, in this case, finality has some benefit for everyone. So that's quite apart from the merits of the case. I hope you understand that. But sometimes as we look at when it looks like a business dispute at the end of the day, sometimes that can assist in that. So we mention that to you. The case is here to be submitted, and we are in recess for the morning. Thank you. Thank you.
judges: B. Fletcher, Thomas, Bea